1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

9

CENTRAL DISTRICT OF CALIFORNIA

10  LAMONT DAVIS,                      )   CASE NO. CV 12-3573-JLS (PJW)
                                       )
11              Petitioner,            )
                                       )
12         v.                          )   FINAL REPORT AND RECOMMENDATION
                                       )   OF UNITED STATES MAGISTRATE JUDGE
13  SCOTT FRAUENHEIM, WARDEN,          )
                                       )
14              Respondent.            )
    _____)

15

16       This Final Report and Recommendation is submitted to the Hon.

17  Josephine L. Staton, United States District Judge, pursuant to 28

18  U.S.C. § 636 and General Order 05-07 of the United States District

19  Court for the Central District of California.  For the reasons

20  discussed below, it is recommended that the Petition be denied and the

21  action be dismissed with prejudice.[1]

22

23

24  _____

25       [1]  This Final Report and Recommendation has been issued to
    address Petitioner's Objections to the magistrate judge's discussion
26  regarding Ground Five.  As Petitioner pointed out, the magistrate
    judge mistakenly referred to the senior criminalist who testified
27  about the DNA evidence as the supervisor of the criminalist who had
    originally performed the DNA testing.  In fact, the senior criminalist
28  was the "technical reviewer," not the supervisor.

I.

SUMMARY OF PROCEEDINGS

A.   State Court Proceedings

In March 2008, a jury in Los Angeles County Superior Court found Petitioner guilty of two counts of forcible rape, burglary, sexual penetration by a foreign object, false imprisonment, and criminal threats.  (Clerk's Transcript ("CT") 485-90.)  The court determined that he had five previous "strike" convictions under California's Three Strikes law and sentenced him to 180 years to life in prison. (CT 425, 531-32, 568-74.)

Petitioner appealed to the California Court of Appeal, which reversed his criminal threats conviction and reduced his sentence to 120 years to life but otherwise affirmed the convictions.  (Lodged Document No. 6.)  He then filed a petition for review in the California Supreme Court, which was denied without prejudice pending the court's decisions in several cases involving the constitutionality of admitting the results of forensic tests performed by criminalists who do not testify at trial.  (Lodged Document Nos. 7-8.)  Petitioner subsequently filed multiple habeas corpus petitions in the Los Angeles County Superior Court, the California Court of Appeal, and the California Supreme Court, all of which were summarily denied.  (Lodged Document Nos. 9-12, 17-24.)

B.   Federal Court Proceedings

Thereafter, Petitioner, proceeding *pro se*, filed a Petition for Writ of Habeas Corpus in this court, pursuant to 28 U.S.C. § 2254, raising the following claims:

1.  The trial court violated his right to confront and cross-examine the victim by excluding evidence of prior false allegations of rape.

2.  The prosecution committed outrageous misconduct in violation of Petitioner's due process rights.

3.  The trial court erred by allowing testimony about Petitioner's prior charged and uncharged sexual misconduct against others.

4.  California Evidence Code § 1108 is unconstitutional in that it permits evidence relating to prior misconduct into evidence.

5.  The admission of testimony regarding DNA testing conducted by another criminalist violated Petitioner's Confrontation Clause rights.

6.  The admission of unreliable expert testimony violated Petitioner's due process rights.

7.  Petitioner received ineffective assistance of counsel.

8.  Counsel was ineffective for not objecting to the admission of unqualified opinion testimony.

9.  Counsel was ineffective for failing to call witnesses to testify that Petitioner had not committed sexual assaults in other similar instances.

10. Counsel was ineffective for failing to object to improper admission of "fresh complaint" testimony.

3

11. The trial court erred by not allowing witness Lisa S. to be impeached with conduct underlying multiple misdemeanor convictions involving moral turpitude.[2]

12. Counsel was ineffective for failing to impeach witness Lisa S.

13. CALCRIM No. 318 lessened the prosecution's burden of proof in violation of Petitioner's constitutional rights.

(Petition at 6A-6B.[3])

## II.

## STATEMENT OF FACTS

The following statement of facts was taken verbatim from the California Court of Appeal's opinion affirming Petitioner's conviction:

### A. *Prosecution*

#### 1. **Charged Crimes**

K.V. lived alone in an apartment [. . .] in Arcadia. She was separated from her husband, Eric []. K.V. and [Eric] had two sons over whom they had lost custody; K.V.'s parents had custody of the boys.

[Eric] and [Petitioner] were musicians in a band together. In 2002 or 2003, while K.V. was living alone, [Petitioner] had phoned her a few times, asking to date her and telling her that he could take better care of her than

---

[2] Petitioner asked to voluntarily dismiss this claim because it was unexhausted. (Docket No. 15.) That request was granted. (Docket No. 16.)

[3] Petitioner did not number two pages between pages 6 and 7 of the Petition. For ease of reference, the Court refers to those pages as 6A and 6B.

1   [Eric] could.  She told him she was not interested and asked

2   him not to call her.

3        On May 17, 2004, [Petitioner] called K.V. and asked to

4   come over to her apartment.  She said she did not want him to

5   come to her apartment.  He then asked to take her to dinner

6   at Denny's.  She said she did not want to meet him anywhere.

7   She told him she had to run errands and was thinking about

8   buying a car.  [Petitioner] told her he knew she was looking

9   for a car and could help her.  K.V. declined his help and

10  hung up the phone.

11       [Petitioner] called again 45 minutes later.  He told

12  K.V. he was on the way to her apartment.  She told him she

13  did not want him to come over.  He asked if [Eric] was there;

14  K.V. said he was not.

15       As K.V. was getting ready to leave the apartment, she

16  saw a hand moving aside the blinds on her front window; she

17  kept the window open part way to allow her cat in and out.

18  She told whoever it was to leave and went to lock her front

19  door.  [Petitioner] pushed the door open.  K.V. attempted to

20  push it closed, but [Petitioner] pushed it open and came in,

21  pushing K.V. back against a wall.  K.V. told [Petitioner] to

22  leave, but he refused.

23       [Petitioner] grabbed at K.V.'s breasts and told her, "We

24  can do it right here."  [Petitioner] dragged K.V. around the

25  apartment by her arm and sometimes by her hair.  As K.V.

26  struggled to escape, [Petitioner] tried unsuccessfully to

27  kiss her face, neck and breasts.  He tried to put his hand

28

5

1    down her pants and to pull her pants down, but K.V. struggled

2    and prevented him from doing so.

3        [Petitioner] pushed K.V. down on the bed; when she tried

4    to get up, he pushed her back.  He lay on top of her so that

5    she could not move.  [Petitioner] took off his pants and

6    pulled down K.V.'s pants and underwear.  He then put his

7    penis inside her vagina and had sexual intercourse with her.

8    It was painful and she told him to stop, but he would not.

9    When he was finished, he got up off of her.  She again asked

10   him to leave, but he did not.  K.V. then tried to leave, but

11   [Petitioner] grabbed her and pulled her back.

12       [Petitioner] pulled K.V. into the bathroom, where he got

13   a disposable razor.  He took K.V. to the kitchen, where he

14   put soap on his face.  He then took K.V. back to the

15   bathroom, where he shaved.  He cut his face, cursed K.V., and

16   used toilet paper to stop the bleeding.

17       While in the bathroom, [Petitioner] pushed K.V. against

18   the sink.  He pulled down her pants and put his finger, and

19   later his penis, in her vagina.  When he was done, he left.

20       Sometime later, [Petitioner] called K.V. and told her

21   not to call the police.  She felt threatened and afraid that

22   [Petitioner] would come back and do something to her if she

23   called the police.

24       K.V. changed her clothes and went to an appointment.

25   She then went to her parents' house and told her mother what

26   had happened.  Her mother called the police.  An officer came

27   to the house and spoke to K.V.  K.V. then went home and took

28   a shower.

6

1     According to Elizabeth V., K.V.'s mother, K.V. called

2  her on May 17 and said that a friend of her husband's had

3  hurt her.  She was crying and her voice was shaking.  K.V.

4  later came over to her mother's house to talk.  She was

5  nervous, scared and jumpy.  At first, she would not talk

6  about what happened, and she told her mother she would be

7  hurt if she called the police.  Later, she told her mother

8  that a friend came by and forced his way into her apartment.

9  It was not until sometime later that K.V. told her mother

10  that the man raped her twice; once on the bed and once in the

11  bathroom.

12     On May 18, K.V. showered again.  She called the police.

13  Arcadia Police Officer Robert Bartley went to K.V.'s

14  apartment and spoke to her there.  K.V. was "[u]pset.

15  Visibly shaking.  [She j]ust seemed to be very timid."  She

16  cried as she told him what had happened.

17     K.V. told Officer Bartley that [Petitioner] had called

18  her several times asking to get together.  [Petitioner] later

19  came over and entered through her door, which was unlocked.

20  He grabbed her by the back of the head and touched her

21  breasts.  K.V. said that [Petitioner] got her on the bed, but

22  she was able to escape briefly and no sexual activity

23  occurred there.  She said that [Petitioner] shaved using her

24  razor and cut himself.  She tried to escape, but he held her

25  down against the bathroom sink and put his finger and his

26  penis in her vagina.

27     Officer Bartley took K.V. to the San Gabriel Valley

28  Medical Center.  Patsy Sims (Sims), Director of the Sexual

7

1  Assault Center, examined K.V.  K.V. told Sims that
2  [Petitioner] assaulted her in the bathroom, penetrating her
3  vagina with his finger and his penis.  K.V. complained of
4  breast tenderness and genital pain while urinating.  During
5  the examination, K.V. was anxious and tearful.

6  Sims found an abrasion above K.V.'s breast, two
7  abrasions on her vagina and a tear to her hymen.[4]  These
8  injuries were consistent with consensual sex as well as
9  forced sex.  Sims found no evidence of injury to K.V.'s head
10 or arms.

11 Officer Bartley contacted [Eric] to get [Petitioner's]
12 address and telephone number.  [Eric] refused to give him the
13 information.

14 The police recovered a razor and a bloody shirt from
15 K.V.'s apartment.  DNA found on the items matched
16 [Petitioner's] DNA.  The rape kit containing fluids collected
17 from K.V. and her home contained no evidence of semen.

18 On May 20, K.V. met with her insurance agent, Susie
19 Vonderohe (Vonderohe) regarding a car insurance claim.
20 Vonderohe noticed that K.V. seemed very distraught.  K.V.
21 told her "something about the window and how somebody was
22 trying to get in through the window."  K.V. said that the
23 person who came into the apartment knew her ex-husband.

24 **2.  Prior Crimes**

25 Lisa S. babysat for [Petitioner] and his wife almost 30
26 years earlier, when she was 15 years old.  When she arrived

27

28 [4]  Sims testified that women who have given birth could still
have hymen tissue that could tear during intercourse.

8

to watch his 13-month old twins, [Petitioner] told her that his wife was at the store.  He began to talk about masturbation.  He then locked the door, put on some music and showed Lisa a book about masturbation.  After that, he took off Lisa's shirt, took her into the bedroom and tied her to the bed.  He took off the rest of Lisa's clothes and put his penis in her vagina.  He did this a second time, and then he took her to the shower, where he again assaulted her twice. While she was still naked, he made her feed his twins. Before she left, he told her he would kill her if she told anyone about what he had done.

Lisa's older sister, Elizabeth W., also baby sat for [Petitioner] and his wife.  One night after babysitting, [Petitioner] was to drive her home.  Instead, he drove to an industrial area.  He told Elizabeth that he had "some issues at home" and needed to talk to her.  He said that his wife "couldn't have sex" and "he was sexually frustrated."  He rubbed her leg and pushed up her dress.  She tried to stop him and threatened to scream, but he said no one would hear her.  He pulled his pants down and masturbated while touching her vagina, eventually ejaculating on her.  After that, she asked to go home, but he told her he would take her when he was ready.  He started masturbating again, and Elizabeth tried to get out of the car.  He told her that if she got out, he would run her over, and no one would see because it was a secluded area.  When he finally took her home, he told her not to tell anyone because no one would believe her.

1   Both Lisa and Elizabeth eventually reported what
2   [Petitioner] had done to them.  Lisa testified in court about
3   the incident with [Petitioner].
4       Janet G. worked with [Petitioner] at the Crescenta
5   Valley Medical Center about 27 years earlier.  One day Janet
6   went to lunch with [Petitioner] and he drove Janet back
7   afterward.  He suggested that they smoke a joint and talk for
8   awhile; she agreed.  While they were sitting in his car, he
9   began to get physical.  When she asked him to stop, he pushed
10  her down and slapped her.  He pulled her pants down and put
11  his penis inside her vagina.  He then forced her to orally
12  copulate him.  When he was done, he drove Janet back and
13  suggested they have lunch again.  Janet told her mother and
14  later testified in court about the incident.
15      In 1990, when Nicole G. was 12 years old, she and
16  another girl went to [Petitioner's] house to play with his
17  children.  When [Petitioner] was driving her home, he stopped
18  and took her to the back seat of his car.  He kissed her and
19  put his tongue in her mouth.  He rubbed her breast.  He put
20  his hand down her underwear, rubbed her vagina and put his
21  finger inside.  He then drove her home and told her not to
22  tell his children.  Before he let her out of the car, he had
23  her kiss his penis.  Nicole later reported the incident to
24  school authorities and the police.

**B.   *Defense***

26      Muha Haddad (Haddad) took care of K.V.'s sons at
27  Elizabeth V.'s home for five or six years.  She saw K.V.
28  several times a month but tried to avoid her, because K.V.

10

did not seem to like her and treated her poorly.  Haddad did not think K.V. was believable, in that K.V. sometimes made false allegations and changed her story.  Haddad thought K.V. was "just angry because [her mother] adopted the children."  Haddad never heard K.V. talk to her mother about [Petitioner].

[Eric] had heard K.V. express jealousy toward his friends, especially his fellow band members, about how much time he spent with them.  He did not remember whether she had ever expressed jealously toward [Petitioner].  He had been at K.V.'s apartment with [Petitioner] on two or three prior occasions.  When he later spoke to [Petitioner], [Petitioner] denied raping K.V.  [Eric] also said that because K.V. was bipolar, it was hard to take her out in public.

When Arcadia Police Detective Sandy Topel was investigating the case, Haddad asked to speak to her.  Haddad said that K.V. lied about everything and could not be believed.  K.V. had a history of falsely accusing Haddad.  K.V. accused her mother and family of doing bad things to her.  Haddad said she heard K.V. talk to her mother about the case and her story kept changing.  Haddad acknowledged, however, that she did not know if K.V. was lying about this case.

Detective Topel also spoke to [Eric].  [Eric] said that K.V. was making up the accusations because she was jealous of the amount of time he spent with [Petitioner].

(Lodged Document No. 6 at 2-7 (footnote renumbered).)

III.

STANDARD OF REVIEW

The standard of review in this case is set forth in 28 U.S.C. § 2254:

> An application for a writ of habeas corpus on behalf of a
> person in custody pursuant to the judgment of a State court
> shall not be granted with respect to any claim that was
> adjudicated on the merits in State court proceedings unless
> the adjudication of the claim--
>
> (1)  resulted in a decision that was contrary to, or
> involved an unreasonable application of, clearly established
> Federal law, as determined by the Supreme Court of the
> United States; or
>
> (2)  resulted in a decision that was based on an
> unreasonable determination of the facts in light of the
> evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court decision is "contrary to" clearly established federal law if it applies a rule that contradicts Supreme Court case law or if it reaches a conclusion different from the Supreme Court's in a case that involves facts that are materially indistinguishable. *Bell v. Cone*, 535 U.S. 685, 694 (2002).  To establish that the state court unreasonably applied federal law, a petitioner must show that the state court's application of Supreme Court precedent to the facts of his case was not only incorrect but objectively unreasonable. *Renico v. Lett*, 559 U.S. 766, 773 (2010).  Where no decision of the Supreme Court has squarely decided an issue, a state court's adjudication of that issue cannot result in a decision that is

12

1  contrary to, or an unreasonable application of, clearly established

2  Supreme Court precedent.  *See Harrington v. Richter*, 562 U.S. 86, 101

3  (2011).

4      Petitioner raised Grounds One, Three through Five, Twelve, and

5  Thirteen in his petition for review in the California Supreme Court,

6  but that court did not explain its reasons for denying them.  (Lodged

7  Document No. 8.)  The appellate court, however, did (Lodged Document

8  No. 6), which this Court presumes is the basis for the state supreme

9  court's subsequent decision denying the claims.  In this situation,

10  the Court looks to the appellate court's reasoning and will not

11  disturb it unless it concludes that "fairminded jurists" would all

12  agree that the state court's decision was wrong.  *Richter,* 562 U.S. at

13  102; *Johnson v. Williams*, 133 S. Ct. 1088, 1094 n.1 (2013) (approving

14  "look through" of state supreme court's silent denial to last reasoned

15  state-court decision).

16      Petitioner raised the remaining grounds in his state habeas

17  petitions in the California Supreme Court, but that court did not

18  explain its reasons for denying the claims.  Nor did the trial court

19  or the appellate court.  As a result, the Court will review the record

20  to determine whether there was *any* reasonable basis for the state

21  court to deny relief.  *Richter,* 562 U.S. at 98; *see also Hein v.*

22  *Sullivan*, 601 F.3d 897, 905 (9th Cir. 2010).

23                              IV.

24                           DISCUSSION

25  A.   Exclusion of Evidence

26      In Ground One, Petitioner claims that the trial court violated

27  his right to confront and cross-examine the victim when it excluded

28

                              13

evidence about her history of making false complaints.  (Petition,

Attached Memorandum at 30-54.)  There is no merit to this claim.

It is well established that the Due Process Clause guarantees a

criminal defendant a meaningful opportunity to present a complete

defense.  *See Chambers v. Mississippi*, 410 U.S. 284, 294 (1973).  That

right is violated when critical defense evidence is excluded from

trial.  *DePetris v. Kuykendall*, 239 F.3d 1057, 1062 (9th Cir. 2001).

However, "[t]he accused does not have an unfettered right to offer

testimony that is incompetent, privileged, or otherwise inadmissible

under standard rules of evidence." *Taylor v. Illinois*, 484 U.S. 400,

410 (1988); *see also United States v. Scheffer*, 523 U.S. 303, 308

(1998) ("A defendant's right to present relevant evidence is not

unlimited, but rather is subject to reasonable restrictions."); *Moses

v. Payne*, 555 F.3d 742, 757 (9th Cir. 2009) (stating defendant's right

to present relevant evidence is subject to reasonable restrictions,

"such as evidentiary and procedural rules").  Furthermore, even if

exclusion of the evidence amounted to error, habeas relief is not

available unless the error had a substantial and injurious effect or

influence on the verdict.  *Brecht v. Abrahamson*, 507 U.S. 619, 638

(1993).

Prior to trial, defense counsel argued that he should be allowed

to cross-examine K.V. regarding her allegedly false accusations that

her father had physically assaulted her when she was 13 years old and

that her husband had physically and sexually abused her and their

children.  Counsel also claimed that K.V. lied about having been raped

by one of her husband's bandmates, having been date-raped when she was

16 years old, and having been sexually assaulted by two men five years

before trial.  The court noted that Petitioner had no witnesses--other

14

1    than K.V.--to prove that any of the allegations were false and that

2    the fact that no charges were filed based on K.V.'s accusations was

3    not evidence that she had lied.  Ultimately, the court precluded

4    defense counsel from cross-examining K.V. about these incidents

5    because the defense could not prove that K.V. had lied and because the

6    cross-examination threatened to distract the jury and consume an undue

7    amount of time.  (*See* Reporter's Transcript ("RT") 907-17, 920, 923,

8    1257-59, 1501-18, 1521-23, 1528, 1532, 1536-38, 2186-90, 2404-12,

9    2475-76.)

10       The California Court of Appeal upheld the trial court's ruling,

11   finding that Petitioner's right to confront K.V. and challenge her

12   credibility was not violated by the exclusion of these allegations:

13          In the absence of any independent evidence that K.V.

14       made false accusations of sexual assault or other crimes, we

15       conclude the trial court did not abuse its discretion in

16       excluding evidence of those accusations under [California

17       Evidence Code] section 352.[5]

18          Additionally, [Petitioner] was able to cast doubt on

19       K.V.'s credibility; he pointed out the discrepancies in the

20       statements she gave different people about what occurred as

21       well as the discrepancies between these statements and her

22       preliminary hearing and trial testimony.  [Petitioner] was

23

24   _____

25      [5]   [California Evidence Code section 352 provides:

26   The court in its discretion may exclude evidence if its
     probative value is substantially outweighed by the
27   probability that its admission will (a) necessitate undue
     consumption of time or (b) create substantial danger of
28   undue prejudice, of confusing the issues, or of misleading
     the jury.]

1    able to establish that K.V. was aware of the need for an

2    examination to preserve DNA evidence yet went home and took

3    a shower before making a police report and going to the

4    hospital for an examination.  [Petitioner] presented a

5    witness, Haddad, as to K.V.'s lack of credibility.  He also

6    presented a witness, [Eric], as to K.V.'s motive for lying.

7         We do not believe that allowing [Petitioner] to

8    cross-examine K.V. about her prior allegations of sexual and

9    other misconduct, which [Petitioner] could not prove were

10   false, might reasonably have produced a significantly

11   different impression of [her] credibility.  Accordingly,

12   there was no violation of [Petitioner's] right to

13   confrontation.

14   (Lodged Document No. 6 at 16-17 (internal quotation marks and

15   citations omitted).)

16        The Court agrees that excluding the alleged impeachment evidence

17   did not violate Petitioner's constitutional rights.  First, as noted

18   by the state courts, the defense had no way of proving that any of

19   K.V.'s previous assault claims were actually false.  (RT 913, 923,

20   1521-22, 2410-11; Lodged Document No. 6 at 17.)  Thus, the unsupported

21   allegations that she had lied in the past had little probative value

22   in undermining her credibility.  *See Tinsley v. Borg*, 895 F.2d 520,

23   531 (9th Cir. 1990) (holding exclusion of impeachment evidence having

24   "little probative value on the issue of her credibility" did not

25   violate constitutional norms); *see also Maravilla v. Rimmer*, 2009 WL

26   1689599, at *15 (C.D. Cal. June 12, 2009) ("Given . . . the absence of

27   evidence that the accusation was false   . . . , the trial court's

28   refusal to allow defense counsel to cross-examine [the victim] about

the prior rape allegation was well within the 'wide latitude' granted
to trial courts to impose reasonable limits on cross-examination.").

Further, most of the alleged assaults occurred years before the
trial.  And some had never been reported to authorities, investigated,
or litigated.  Thus, the first time any of the issues would have been
explored regarding some of the incidents would have been at
Petitioner's trial.  This would have necessitated mini trials within
the trial, drawing attention away from the case against Petitioner and
consuming an undue amount of time.  This is a valid reason for not
allowing the inquiry.  *See, e.g., People v. Tidwell*, 163 Cal. App.4th
1447, 1458 (2008) (upholding exclusion of prior rape complaints by
victim because there was "no conclusive evidence that her prior rape
complaints were false" and would, thus, "have resulted in an undue
consumption of time").

Finally, to the extent that the trial court erred by excluding
the evidence, the error was harmless.  The jury heard testimony
calling K.V.'s credibility into question.  During her opening
statement, the prosecutor acknowledged that, "due to [K.V.'s] mental
health issues," her sons had been adopted by her mother and were being
raised by her parents.  (RT 948.)  K.V.'s husband testified that she
was "bipolar," which made it "hard to take her out in public."  (RT
2752.)  He also testified that, due to K.V.'s false allegation that he
had sexually assaulted their sons, he lost custody of the children.
(RT 1305-07.)  Thus, there was "sufficient information" for the jury
to "appraise the bias and motives of the witness."  *Skinner v.
Cardwell*, 564 F.2d 1381, 1389 (9th Cir. 1977); *see also Wood v. State
of Alaska*, 957 F.2d 1544, 1550 (9th Cir. 1992) (stating that there is

17

1  no Sixth Amendment violation so long as the jury has sufficient

2  information upon which to assess the credibility of a witness).

3      There was also other evidence of guilt aside from K.V.'s

4  testimony.  The jury heard uncontradicted testimony from several other

5  victims that Petitioner had sexually assaulted them, revealing

6  Petitioner's propensity to assault young women.  Moreover, the jury

7  heard testimony from Elizabeth V., Officer Bartley, and Vonderohe that

8  K.V. appeared distraught, nervous, and frightened immediately after

9  the attack.  Finally, there was blood/medical evidence that supported

10 a finding that K.V. had been sexually assaulted.  In sum, the state

11 court's rejection of Petitioner's challenge to the exclusion of

12 impeachment evidence was reasonable.  Accordingly, Petitioner is not

13 entitled to federal habeas relief on this claim.

14 B.   Prosecutorial Misconduct

15     In Ground Two, Petitioner claims that the prosecutor committed

16 "outrageous" misconduct in violation of his due process rights.

17 (Petition, Attached Memorandum at 55-99.)  There is no merit to this

18 claim.

19     Petitioner claims that he took and passed a polygraph test and

20 argues that the prosecutor committed misconduct by prosecuting him

21 anyway.  (Petition, Attached Memorandum at 55.)  Petitioner, however,

22 has not offered any evidence that he took and passed a polygraph test.

23 Further, even if he did, a polygraph test does not establish

24 innocence.  *See Cortes v. Mills*, 2011 WL 6965804, at *5 (D. Or. July

25 18, 2011) ("Assuming a polygraph has some probative value, it cannot,

26 standing on its own, prove that petitioner is actually innocent.").

27 As such, the prosecutor's decision to prosecute Petitioner despite the

28 test would not amount to misconduct, particularly in light of other

substantial evidence establishing Petitioner's guilt.  *See, e.g.,*
*Bashor v. Risley*, 730 F.2d 1228, 1240 (9th Cir. 1984) (finding no
misconduct where the prosecutor argued that the defendant had one
intention when an inadmissible polygraph test suggested that he had a
different intention).

Petitioner argues that the prosecutor should have known that he
was innocent because K.V. had repeatedly lied.  (Petition, Attached
Memorandum at 55-86.)  Again, the Court disagrees.  Inconsistent
statements by a witness are not enough to establish that a witness's
testimony is false.  *See United States v. Croft*, 124 F.3d 1109, 1119
(9th Cir. 1997) ("The fact that a witness may have made an earlier
inconsistent statement, or that other witnesses have conflicting
recollections of events, does not establish that the testimony offered
at trial was false.").  Moreover, any alleged inconsistencies in
K.V.'s statements fall far short of establishing that the prosecutor
committed misconduct by offering her testimony.  *See United States v.*
*Zuno-Arce*, 44 F.3d 1420, 1423 (9th Cir. 1995) (holding conflicting
witness statements did not establish that the prosecutor knew that the
testimony of any of the witnesses was false and observing that
"[l]awyers in criminal cases, for prosecution and defense, sometimes
swim in a sea of lies, and must necessarily trust the jury to
determine what is true, or whether reasonable doubt remains about what
is true").

Petitioner next faults the prosecutor for charging him with
making criminal threats for telling K.V. that she should not report
the rape to authorities.  The jury convicted Petitioner of this charge
but the conviction was overturned on appeal based on insufficient

evidence. (Petition, Attached Memorandum at 87; Lodged Document No. 6 at 19-21.)

The fact that the appellate court found that there was insufficient evidence does not prove that the Petitioner never made such a threat or that the prosecutor erred in bringing the charges in the first place. In fact, K.V. testified that Petitioner had called her after the attack and told her not to report it to police. (RT 1269-72.) That evidence alone was sufficient to charge Petitioner with making a threat.[6]

Petitioner contends that the prosecutor committed misconduct by introducing other items from K.V.'s apartment, like a towel, running shoes, a comforter, and photographs, which Petitioner complains were not linked to him by DNA or fingerprint evidence. (Petition, Attached Memorandum at 91-92.) There is no requirement that evidence be linked to a defendant by DNA or fingerprints in order to be admissible. Further, the trial court never prohibited the prosecutor from introducing this evidence; therefore, the prosecutor could not have committed misconduct by introducing it. *See United States v. Cabrera*, 201 F.3d 1243, 1247 (9th Cir. 2000) (finding no misconduct introducing evidence because "the district court never barred any mention of" it). Further, Petitioner has not demonstrated that the admission of this evidence, which was tangential to the case, prejudiced his case.

Finally, Petitioner claims that the prosecutor committed misconduct in closing when she argued: (1) "everything in [K.V.'s] life was basically served up to you on a silver platter"; (2) a

---

[6] In fact, K.V. testified that, after the sexual assault, Petitioner called her and told her not to contact the police. While K.V. did not recall his words, she "felt threatened" and thought he might "come back and do something" if she reported the incident.

1   defense witness was not believable; and (3) Petitioner threatened to
2   kill K.V. if she called the police.  (Petition, Attached Memorandum at
3   53, 89, 96; *see also* RT 3036, 3040-41, 3049.)  There is no merit to
4   any of these claims.

5        Prosecutors are given wide latitude in closing argument and may
6   strike hard blows based on the evidence in the case and reasonable
7   inferences drawn from that evidence.  *See Berger v. United States*, 295
8   U.S. 78, 88 (1935).  In doing so, they are free to rebut arguments
9   made by defense counsel and, in doing so, may argue that one witness
10  is more believable than another.  *United States v. Sayetsitty*, 107
11  F.3d 1405, 1409 (9th Cir. 1997); *Duckett v. Godinez*, 67 F.3d 734, 742
12  (9th Cir. 1995).  With these rules in mind, it is clear that
13  Petitioner has not demonstrated that the prosecutor committed
14  misconduct in the closing argument.  Accordingly, the state court's
15  rejection of this claim was reasonable and will not be disturbed.

16  C.   Prior Misconduct Evidence

17       In Grounds Three and Four, Petitioner contends that the admission
18  of evidence of Petitioner's prior sexual offenses pursuant to
19  California Evidence Code §§ 352 and 1108 violated his constitutional
20  rights.  For the following reasons, this claim is denied.

21       Generally speaking, a claim that a state court erred in admitting
22  evidence based on its interpretation of state law is not cognizable in
23  federal habeas corpus proceedings.  *See Estelle v. McGuire*, 502 U.S.
24  62, 67-68 (1991) ("[I]t is not the province of a federal habeas court
25  to reexamine state-court determinations on state-law questions.").  To
26  the extent that Petitioner is challenging the trial court's admission
27  of this evidence under state law, the claim is rejected.

28

As to Petitioner's claim that the introduction of this evidence violated federal law, that claim, too, is rejected for the reasons explained below.

The trial court allowed the prosecution to introduce evidence concerning four of Petitioner's prior sexual assault offenses: (1) two 1979 convictions for assaults on teenagers Lisa S. and sister, Becky W.; (2) a 1982 conviction for rape and oral copulation by force against 25-year-old Janet G.; and (3) a 1991 conviction for a lewd act with a child and penetration by force against 12-year-old Nicole G. (RT 10-13, 24.)  On appeal, the California Court of Appeal held the evidence was properly admitted and that California § 1108 was constitutional.[7]  (Lodged Document No. 6 at 17-19.)

Petitioner argues that the prior offenses should have been excluded because they were improperly admitted to show propensity, were not similar to the charged offense, were so remote in time that they lacked relevance, and likely confused, misled, and inflamed the jury.  (Petition, Attached Memorandum at 100-47).  These arguments are without merit.

The United States Supreme Court has expressly declined to decide whether the introduction of evidence of prior bad acts to show propensity to commit a crime violates due process.  *See Estelle*, 502 U.S. at 75 n.5 ("[W]e express no opinion on whether a state law would violate the Due Process Clause if it permitted the use of 'prior

_____

[7]  California Evidence Code § 1108(a) provides:

In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352.

22

crimes' evidence to show propensity to commit a charged crime.");
*Larson v. Palmateer*, 515 F.3d 1057, 1066 (9th Cir. 2008) ("The Supreme
Court has expressly reserved the question of whether using evidence of
the defendant's past crimes to show that he has a propensity for
criminal activity could ever violate due process."). As such, the
state court's rejection of Petitioner's argument in this regard could
not be contrary to clearly established federal law as determined by
the United States Supreme Court. *See Mejia v. Garcia*, 534 F.3d 1036,
1046 (9th Cir. 2008). Furthermore, "[t]he admission of relevant
evidence, by itself, cannot amount to a constitutional violation. Nor
does the admission of even highly prejudicial evidence necessarily
trespass on a defendant's constitutional rights." *United States v.
LeMay*, 260 F.3d 1018, 1027 (9th Cir. 2001) (concluding that the trial
court's admission of sexual propensity evidence did not violate due
process or render trial fundamentally unfair). Rather, the
introduction of prior misconduct evidence will violate a defendant's
due process right to a fundamentally fair trial only if it has no
relevance and "its prejudicial effect far outweighs its probative
value." *Id.* at 1026; *see also McKinney v. Rees*, 993 F.2d 1378,
1384-85 (9th Cir. 1993) (admitting propensity evidence will violate
the constitutional right to a fair trial only if no permissible
inferences can be drawn from the evidence and its potential for
prejudice far outweighs the relevance).

The evidence of Petitioner's prior sexual assaults permitted the
jury to draw the reasonable inference that Petitioner was inclined to
forcibly, sexually assault women. *See Roettgen v. Ryan*, 639 F. Supp.
2d 1053, 1064 (C.D. Cal. 2009) ("[U]nder both state law and federal
law, the jury could permissibly infer from [the witness's] testimony

23

1   regarding the prior molestation that petitioner had the propensity to
2   engage in sexual conduct with adolescent males.").  Accordingly, the
3   admission of Petitioner's prior sexual assaults did not violate due
4   process or render the trial fundamentally unfair.

5        Petitioner claims that California Evidence Code § 1108 violates
6   equal protection because it discriminates against defendants charged
7   with sexual offenses.  (Petition, Attached Memorandum at 143-46.)
8   Petitioner has failed to show, however, that he is a member of a
9   suspect class or that the challenged provision burdens a fundamental
10  right.  *See LeMay*, 260 F.3d at 1030 ("[A defendant] has no fundamental
11  right to have a trial free from relevant propensity evidence that is
12  not unduly prejudicial."); *see also Porter v. McGrath*, 268 Fed. Appx.
13  676, 677 (9th Cir. 2008).  For these reasons, this claim is rejected.

14       Finally, Petitioner argues that California Evidence Code § 1108
15  violates ex post facto principles.  (Petition, Attached Memorandum at
16  150-77.)  The Ninth Circuit has explicitly held that it does not.  *See*
17  *Schroeder v. Tilton*, 493 F.3d 1083, 1088 (9th Cir. 2007) ("The state
18  court did not err in concluding that § 1108 is an 'ordinary' rule of
19  evidence that does not violate the Ex Post Facto Clause.").

20       For all these reasons, the admission of Petitioner's prior sexual
21  offenses did not violate his constitutional rights.

22  D.   Erroneous Admission of Expert Testimony

23       In Grounds Five and Six, Petitioner contends that the trial court
24  should not have allowed the forensic examiner to testify that
25  Petitioner's DNA was found in K.V.'s apartment because she had not
26  performed the DNA testing.  (Petition, Attached Memorandum at 178-
27  205.)  There is no merit to these claims.

28

The Confrontation Clause of the Sixth Amendment guarantees a criminal defendant the right to confront and cross-examine witnesses. *See Pennsylvania v. Ritchie*, 480 U.S. 39, 51 (1987).  As a result, testimonial statements of a witness who does not appear at trial may not be admitted into evidence unless the witness is unavailable and the defendant has had a prior opportunity to cross-examine the witness. *Crawford v. Washington*, 541 U.S. 36, 68 (2004).  To prevail on a Confrontation Clause claim, however, a defendant must also show that the admission of the testimony resulted in prejudice. *See Slovik v. Yates*, 556 F.3d 747, 755 (9th Cir. 2009); *see also Melendez–Diaz v. Massachusetts*, 557 U.S. 305, 329 n.14 (2009) (noting Confrontation Clause error subject to harmless error review).  The Supreme Court has clarified that forensic documents created for evidentiary purposes are testimonial in nature and subject to *Crawford's* strictures. *See Bullcoming v. New Mexico*, 131 S. Ct. 2705, 2714–15 (2011); *Melendez–Diaz*, 557 U.S. at 311.

At trial, Senior Criminalist Kari Woshida testified that she was the "technical reviewer" of the DNA test performed by Criminalist Glen Lamas on blood evidence collected from the victim's shirt and razor. (RT 2117-19.)  Woshida explained to the jury the procedures used to ensure the accuracy of the testing and testified that she reviewed the data collected by Lamas for any errors.  (RT 2119-21, 2127-28.) Woshida also testified that Petitioner's DNA, but not the victim's DNA, matched the DNA from the blood stains found on the victim's shirt and razor.  (RT 2127-33.)  Lamas did not testify at trial.

Petitioner complains that allowing Woshida to testify about the results of DNA tests Lamas performed violated his Confrontation Clause rights.  (Petition, Attached Memorandum at 178-97.)  The California

Court of Appeal rejected this claim, relying on state court precedent,

holding that DNA testing results were not testimonial in nature and,

therefore, were not subject to the Confrontation Clause. (Lodged

Document No. 6 at 21-22.)  In particular, the court distinguished

Petitioner's case for *Melendez-Diaz*:

> Here, by contrast, Woshida testified as to the DNA
> testing procedures used and the safeguards, and her
> technical review of Lamas's work to make sure there were no
> errors and that his analysis was correct and her review of
> the results.  She explained how the testing worked, the
> results and the significance of those results.  She was
> available for cross-examination as to her testimony.  Thus,
> unlike the situation in *Melendez-Diaz*, [Petitioner] had the
> opportunity for cross-examination to ensure the accuracy of
> evidence admitted.

(Lodged Document No. 6 at 22.)

The Court agrees that this case is markedly different from

*Melendez-Diaz*, where the Supreme Court found that the admission of

affidavits containing scientific test analysis, without any testimony

by the analysts themselves, violated the Confrontation Clause.[8]  Here,

---

[8]  Petitioner's reliance on the Supreme Court's decision in
*Bullcoming* is unavailing because *Bullcoming* was decided after the
state court denied his Confrontation Clause claim on the merits.  *See
Meras v. Sisto*, 676 F.3d 1184, 1187 (9th Cir. 2012) (finding
*Bullcoming* did not constitute clearly established federal law because
it was issued after the state court's denial of the claim on the
merits).  Even were the Court to consider the holding in *Bullcoming*,
however, it would not afford Petitioner a basis for habeas relief.  In
*Bullcoming*, the Supreme Court held that the admission of a lab report
on a defendant's blood-alcohol test prepared by a non-testifying
analyst through the "surrogate testimony" of another analyst who had
neither performed nor observed the testing procedure violated the

Petitioner's counsel was given an unfettered opportunity to cross-examine Woshida, the criminalist who explained the DNA testing protocols and reviewed Petitioner's DNA test results.  (*See* RT 2134-40.)

Moreover, Woshida testified that, in her opinion, Petitioner's DNA matched the DNA from the blood found in the victim's room based on Lamas's report.  The Supreme Court has repeatedly upheld the use of hearsay testimony by experts to explain their opinion.  *See, e.g., Williams v. Illinois*, 132 S. Ct. 2221, 2228 (2012) ("Under settled evidence law, an expert may express an opinion that is based on facts that the expert assumes, but does not know, to be true" because the Confrontation Clause "has no application to out-of-court statements that are not offered to prove the truth of the matter asserted.").  Applying this principle, the *Williams* Court found no Confrontation Clause violation in an expert's reference to a DNA report from an unavailable technician because the report was prepared during the normal course of business and was not facially incriminating.  *Id.* at 2243-44 (noting DNA report at issue was "very different" from the forensic reports in *Melendez-Diaz* and *Bullcoming* because "[t]he technicians who prepare a DNA profile generally have no way of knowing

Confrontation Clause.  131 S. Ct. at 2715-16.  Petitioner has not demonstrated that that is what happened here.  Rather, Woshida testified that she was the "technical reviewer" of Lamas's work and had checked and verified the accuracy of the DNA data.  *See Bullcoming*, 131 S. Ct. at 2722 (Sotomayor, J., concurring in part) (noting *Bullcoming* did not involve "a case in which the person testifying is a supervisor, reviewer, or someone else with a personal, albeit limited, connection to the scientific test at issue"); *see also Meras*, 676 F.3d at 1192 (finding no violation clearly established federal law because the testifying witness, who was the "technical reviewer" of the DNA data, "may have had enough involvement . . . to satisfy the Confrontation Clause") (Bea, J., concurring).

whether it will turn out to be incriminating or exonerating--or both").

In short, there simply is no clearly established Supreme Court law that a criminalist's testimony about DNA findings from a forensic test completed by another criminalist violates the Confrontation Clause where, as here, the testifying witness reviewed the work and was subject to cross-examination. *See United States v. Pablo,* 696 F.3d 1280, 1293 (10th Cir. 2012) ("[T]he manner in which, and degree to which, an expert may merely rely upon, and reference during her in-court expert testimony, the out-of-court testimonial conclusions in a lab report made by another person not called as a witness is a nuanced legal issue without clearly established bright line parameters . . . ."); *Flournoy v. Small*, 681 F.3d 1000, 1002, 1005 (9th Cir. 2012) (noting absence of clearly established federal law, even after *Bullcoming,* addressing the constitutionality of surrogate testimony from a witness who had performed a "technical review" of the scientific test), *cert. denied*, 133 S. Ct. 880 (2013).

In light of *Crawford* and its progeny, the state appellate court reasonably concluded at the time of its decision that Woshida's testimony did not run afoul of the Confrontation Clause.  Moreover, to the extent that the trial court erred in admitting her testimony, the error was harmless because the DNA evidence did nothing more than establish that Petitioner had been in K.V.'s apartment–a fact he did not directly contest at trial.  The DNA evidence in no way proved that Petitioner and K.V. had sex, let alone that he raped her.  Thus, it is not reasonably likely that the blood evidence had any impact on the

1    outcome of the trial.[9]  *See, e.g., Middleton v. Roper*, 455 F.3d 838,

2    857 (8th Cir. 2006) (finding any Confrontation Clause error to be

3    harmless because the testimony "did not directly implicate" the

4    defendant and "addressed a rather minor point in the proceedings").

5         Next, Petitioner contends that Woshida erred when she testified

6    that there was a one in nine quadrillion chance that the DNA from the

7    blood would match someone at random in the population. (Petition,

8    Attached Memorandum at 198-205; *see* RT 2133.)  He argues that this

9    unreliable testimony allowed the prosecutor to commit the

10   "prosecutor's fallacy" by telling the jury that, "but for that blood

11   stain on the bottom of this shirt, we might not be here."  (Petition,

12   Attached Memorandum at 194; RT 3051.)

13        In *McDaniel v. Brown*, the Supreme Court explained:

14            The prosecutor's fallacy is the assumption that the

15        random match probability is the same as the probability

16        that the defendant was not the source of the DNA sample.

17        In other words, if a juror is told the probability a member

18        of the general population would share the same DNA is 1 in

19        10,000 (random match probability), and he takes that to

20        mean there is only a 1 in 10,000 chance that someone other

21        than the defendant is the source of the DNA found at the

22        crime scene (source probability), then he has succumbed to

23        the prosecutor's fallacy.  It is further error to equate

24        source probability with probability of guilt, unless there

25        is no explanation other than guilt for a person to be the

26    _____

27        [9]  In his closing argument, defense counsel acknowledged that
     Petitioner had been to K.V.'s apartment "on various occasions in the
28   past" and that there was no way to know how old the blood was.  (RT
     3064.)

1    source of crime-scene DNA.  This faulty reasoning may

2    result in an erroneous statement that, based on a random

3    match probability of 1 in 10,000, there is a .01% chance

4    the defendant is innocent or a 99.99% chance the defendant

5    is guilty.

6  558 U.S. 120, 128 (2010) (citation omitted).

7      Woshida did not commit the "prosecutor's fallacy" because she

8  limited her testimony to explaining the probability that a member of

9  the population other than Petitioner had the DNA profile found on the

10  razor and shirt and did not contend that that probability equated to

11  the probability of Petitioner's guilt.  (*See* RT at 2127-34.)  Nor did

12  the prosecutor mislead the jury by emphasizing the fact that the blood

13  evidence could be used to confirm K.V.'s account of how the assault

14  had occurred.[10]

15      Further, any error was harmless because this was not an instance

16  in which the DNA was used to identify a previously unknown attacker.

17  K.V. knew Petitioner and testified that he was the source of the blood

18  on her shirt and razor.  *See Brown v. Farwell*, 525 F.3d 787, 795 (9th

19  Cir. 2008) (noting prosecutor's fallacy could lead to error where

20  other evidence establishing guilt is weak), *reversed sub nom.*

21  *McDaniel*, 558 U.S. 120.  And, as explained above, the DNA evidence in

22  no way proved that Petitioner had sex with K.V. or that he sexually

23  assaulted her.  It merely bolstered her claim that he was there that

24  night.  For these reasons, Petitioner's claim is rejected.

25  ——————————————

26      [10]  In closing, the prosecutor argued, "How else would that shirt
    have had blood stains on the back of the upper collar had [Petitioner]

27  not pushed that area over the sink and entered from . . . behind[,]
    [b]rutalizing her with a finger and inserting his penis into her

28  vagina, and he was watching himself in the mirror when he did it."
    (RT 3051.)

E.    Ineffective Assistance of Counsel

In Grounds Seven through Ten and Twelve, Petitioner argues that his trial counsel provided ineffective assistance.  (Petition, Attached Memorandum at 202–22, 229-32.)  For the reasons explained below, the Court finds that there is no merit to these claims.

The Sixth Amendment right to counsel guarantees not only assistance, but effective assistance, of counsel.  *See Strickland v. Washington*, 466 U.S. 668 (1984).  In order to prevail on a claim of ineffective assistance of counsel, Petitioner must establish two things: (1) counsel's performance fell below an "objective standard of reasonableness" under prevailing professional norms; and (2) the deficient performance prejudiced the defense, i.e., "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id*. at 687–88, 694.  A claim of ineffective assistance must be rejected upon finding either that counsel's performance was reasonable or that the alleged error was not prejudicial.  *Id*. at 697.  The *Strickland* standard applies equally to claims of ineffective assistance of appellate counsel.  *Smith v. Robbins*, 528 U.S. 259, 285 (2000).

In Ground Seven, Petitioner provides a laundry-list of claims about trial counsel's preparedness, complaining counsel failed to call rebuttal witnesses, failed to negate expert witness testimony, failed to request evidentiary hearings, failed to adequately cross-examine witnesses, etc.  He argues that counsel suffered two "serious" bike accidents during the time leading up to the trial, which Petitioner believes "hindered his ability to be effective."  (Petition, Attached Memorandum at 204.)  As explained below, these allegations are speculative and unconvincing.

Petitioner faults counsel for not calling rebuttal and impeachment witnesses, yet he offers no evidence that these witnesses existed, were available for trial, were willing to testify on his behalf, and would have helped his defense.  Absent such proof, he is not entitled to relief.  *See, e.g., Bragg v. Galaza*, 242 F.3d 1082, 1088 (9th Cir. 2001) (finding mere speculation that witness might have given helpful information if interviewed not enough to establish ineffective assistance); *Dows v. Wood*, 211 F.3d 480, 486–87 (9th Cir. 2000) (denying ineffective assistance claim for failing to call witnesses when petitioner failed to submit declarations setting out what witness would have said).  Similarly, he faults counsel for not objecting to the prosecutor's false and misleading statements as well as to the admission of "baseless" evidence, but fails to explain how the statements he complains of were false or why the evidence was not properly admitted.  *See James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994) ("Conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief.").  Finally, he claims that counsel was ill-prepared because of a lack of attention to the case due to injuries suffered from bike accidents.  This argument is wholly speculative and without support in the record.

Petitioner claims that his trial counsel failed to challenge nurse Patsy Simm's qualifications to render an opinion as to the nature of K.V.'s injuries that she observed during the sexual assault examination.[11]  (Petition, Attached Memorandum at 207-14.)  Simms testified that she was a registered nurse and Director of the Sexual

---

[11]  The Court notes that the California Court of Appeal spelled her name "Sims," but at trial she testified that her name was spelled "Simms."  (RT 1614.)

1    Assault Center.  (RT 1614-15.)  She explained that she had taken

2    courses on sexual assault and forensic examination, had earned an

3    associate's degree, and had been conducting sexual assault

4    examinations during the 11 years preceding the trial.[12]  (RT 1615-16.)

5    She had testified on other occasions as an expert regarding sexual

6    assault examinations.  (RT 1616, 1806.)

7         Under California law, Simms was more than qualified to opine on

8    the nature and causes of K.V.'s injuries.  *See People v. Mayfield*, 14

9    Cal. 4th 668, 766 (1997) ("[A] particular expert is sufficiently

10   qualified if the witness has sufficient skill or experience in the

11   field so that his or her testimony would be likely to assist the jury

12   in the search for the truth."), *overruled on other grounds by People*

13   *v. Scott*, 61 Cal. 4th 363, 390 n.2 (2015).  Petitioner has not

14   demonstrated what testimony could have "undermined" Simms'

15   qualifications.  Further, because Simms opined that K.V.'s injuries

16   could have been from either sexual assault or consensual intercourse,

17   her testimony was not crucial to the outcome of the case.

18   Accordingly, Petitioner has not demonstrated how any failure on

19   counsel's part to impeach her was prejudicial.

20        Finally, Petitioner's claims that counsel should have presented

21   "rebuttal" expert testimony to counter Simm's testimony.  This

22   argument is not based on any evidence and is entirely speculative.

23   For that reason, it is rejected.  *See Grisby v. Blodgett*, 130 F.3d

24   365, 373 (9th Cir. 1997) ("Speculation about what an expert could have

25   said is not enough to establish prejudice.").

26   _____

27        [12]  At the time of the trial, Simms was working toward a
     bachelor's degree.  Although Petitioner attacks her for exaggerating
28   her education by claiming to have a bachelor's degree, Simms corrected
     that mistake on direct examination.  (*See* RT 1615, 1806.)

1    Petitioner faults counsel for not calling women to testify that

2  he could have sexually assaulted them but did not.  (Petition,

3  Attached Memorandum at 215.)  This argument is specious.  Presumably,

4  Petitioner did not sexually assault every girl or woman he had contact

5  with in his lifetime.  The fact that some of them would have testified

6  to that fact would have done little or nothing to establish what

7  happened in K.V.'s apartment that day.

8    Petitioner argues that his counsel should have objected to the

9  testimony of insurance adjustor Susie Vonderohe, Elizabeth V., and

10  K.V.'s mother on the ground that it was inadmissible under

11  California's "fresh complaint" doctrine and did not comport with due

12  process.[13]  (Petition, Attached Memorandum at 220-22.)

13    As for Vonderohe's testimony, counsel did object, but the

14  objection was overruled.  (RT 1893-95.)  As such, the claim relating

15  to her testimony is rejected.  Presumably, the court would have ruled

16  similarly regarding Elizabeth V.'s and K.V.'s mother's testimony.

17  Thus, any deficiency by counsel was harmless.  *See Juan H. v. Allen*,

18  408 F.3d 1262, 1273 (9th Cir. 2005) ("[T]rial counsel cannot have been

19  ineffective for failing to raise a meritless objection.")

20    In any event, it is clear that the testimony did not run afoul of

21  due process.  The admission of evidence violates due process only when

22  "there are *no* permissible inferences the jury may draw from the

23  evidence."  *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991).

24  Here, the testimony was relevant to show that K.V. told others about

25

26    [13]  California's "fresh complaint" doctrine precludes testimony
27  from a witness regarding details of a previously made complaint but
    allows the witness to testify about "the fact of the making of the
28  complaint and other circumstances material to this limited purpose."
    *People v. Brown*, 8 Cal. 4th 746, 763 (1994).

the assault in conformity with her testimony at trial and to explain why she did not immediately call the police after the assault. Thus, Petitioner has failed to demonstrate that counsel was constitutionally ineffective.

Petitioner contends that his trial counsel was ineffective for failing to impeach Lisa S. with her prior felony burglary convictions. (Petition, Attached Memorandum at 229-32.) This claim, too, is rejected.

Prior to trial, the court ordered the prosecution to turn over information about Lisa S.'s two prior felony burglary convictions. (Lodged Document No. 6 at 23.) Defense counsel, however, failed to ask Lisa S. about the convictions during cross-examination and the prosecutor refused to stipulate to the prior convictions after Lisa S. had finished testifying and had been excused. (Lodged Document No. 6 at 24.) Petitioner contends this amounted to ineffective assistance of counsel. The California Court of Appeal disagreed:

> Lisa was only one of four witnesses who testified as to prior sexual assaults by [Petitioner]. In light of the testimony of the other three witnesses, it is not reasonably probable that the jury would have completely discredited Lisa and acquitted [Petitioner] had Lisa been impeached with her prior convictions.

(Lodged Document No. 6 at 25.)

The Court agrees. Even without Lisa S.'s testimony, Petitioner would have been convicted in this case. The fact that counsel missed an opportunity to raise doubts about her credibility did not have any

1   impact on the outcome of this trial.  As such, this claim is rejected,

2   too.[14]

3   F.   <u>Jury Instructional Error</u>

4        In Ground Thirteen, Petitioner claims that the trial court

5   lessened the prosecution's burden of proof when it instructed the jury

6   that it should presume that victim's pretrial statements were

7   truthful.  (Petition, Attached Memorandum at 233-42.)  There is no

8   merit to this argument.

9        It is well established that jury instructions that relieve the

10  state of the burden of proving beyond a reasonable doubt every element

11  of the charged offense violate a defendant's right to due process.

12  *Carella v. California*, 491 U.S. 263, 265 (1989).  Nevertheless, "not

13  every ambiguity, inconsistency, or deficiency in a jury instruction

14  rises to the level of a due process violation.  The question is

15  whether the ailing instruction . . . so infected the entire trial that

16  the resulting conviction violates due process."  *Middleton v. McNeil*,

17  541 U.S. 433, 437 (2004) (internal quotation marks omitted).  In

18  determining whether there was a due process violation, a reviewing

19  court must consider the faulty instruction in the context of the

20  instructions as a whole.  *Estelle*, 502 U.S. at 72.  Even if an

21  instructional error occurred, however, habeas relief is only warranted

22  if a petitioner can establish that the instruction had a substantial

23

24  _____

25       [14]  Petitioner claims that appellate counsel was ineffective for
     failing to raise several of these issues on appeal.  Because the
26   underlying claims were not meritorious, appellate counsel could not
     have been ineffective for not raising them.  *See Wildman v. Johnson*,
27   261 F.3d 832, 840 (9th Cir. 2001) ("[A]ppellate counsel's failure to
     raise issues on direct appeal does not constitute ineffective
28   assistance when appeal would not have provided grounds for
     reversal.").

1    and injurious effect or influence in determining the jury's verdict.

2    *Calderon v. Coleman*, 525 U.S. 141, 145 (1998).

3        Petitioner contends that the trial court erred when it instructed

4    the jury with CALCRIM 318 as follows:

5            You have heard evidence of a statement[] that a

6        witness made before the trial.  If you decide that the

7        witness made those statements, you may use those statements

8        in two ways:

9            1. To evaluate whether the witness's testimony in

10       court is believable;

11           AND

12           2. As evidence that the information in those earlier

13       statements is true.

14   (CT 461.)

15       The California Court of Appeal rejected this claim, finding:

16           CALCRIM No. 318 instructs the jury that it *may* use the

17       out-of-court statements in assessing the credibility of a

18       witness's in-court testimony, and it *may* use the statements as

19       evidence of the truth of those statements.  No presumption is

20       created.

21           Additionally, the jury was instructed pursuant to

22       CALCRIM No. 220 that in deciding whether the People proved

23       their case beyond a reasonable doubt, the jury "must

24       impartially compare and consider all the evidence that was

25       received throughout the entire trial."  The jury was further

26       instructed pursuant to CALCRIM No. 105 that among the

27       factors the jury could consider in evaluating a witness's

28       credibility was, "Did the witness make a statement in the

37

past that is consistent or inconsistent with his or her
testimony?"  We presume that the jurors were "able to
correlate, follow, and understand the court's instructions."
(Lodged Document No. 6 at 26 (citation omitted).)

Considered in the context of the instructions as a whole, CALCRIM No. 318 did not lower the standard of proof or require jurors to presume that K.V.'s pretrial statements were truthful.  Rather, the instructions provided that the jury could use the pretrial statements to decide whether the in-court testimony was believable *only if* it found that the witness actually made such a statement.  *See, e.g., Cunningham v. Uribe*, 2013 WL 875485, at *11 (N.D. Cal. Mar. 7, 2013) ("CALCRIM No. 318 does not compel the jury to conclude the prior statements are true.  Rather, it permits the jury to consider the statements as true only if it first finds the witness did, in fact, make the earlier statements."); *Butts v. Cate*, 2012 WL 1309184, at *6-7 (N.D. Cal. Apr. 16, 2012) (rejecting claim that CALCRIM No. 318 created a presumption of truthfulness or altered the burden of proof).  Accordingly, Petitioner is not entitled to federal habeas relief on this claim.

V.

RECOMMENDATION

For these reasons, IT IS RECOMMENDED that the Court issue an Order (1) accepting this Final Report and Recommendation and (2)

1  directing that Judgment be entered denying the Petition and dismissing

2  the case with prejudice.

3

4      DATED: November 20, 2015.

5

6                                    _____
                                     PATRICK J. WALSH
7                                    UNITED STATES MAGISTRATE JUDGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28  S:\PJW\Cases-State Habeas\DAVIS, L 3573\FinalR&R.wpd

                                    39